United States District Court
Middle District of Florida
Jacksonville Division

**KIRAN KUMAR REDDY KONDAPALLI,**

    *Plaintiff,*

v.                                                            No. 3:22-CV-896-TJC-PDB

**FIDELITY NATIONAL INFORMATION SERVICES,**

    *Defendant.*

## Report & Recommendation

Kiran Kumar Reddy Kondapalli, proceeding pro se, sues Fidelity National Information Services, Doc. 1, and moves to proceed in forma pauperis, Doc. 2. Under the in forma pauperis statute, a court "shall dismiss the case at any time if the court determines that … the action … fails to state a claim on which relief may be granted[.]" 28 U.S.C. § 1915(e)(2)(B)(ii). Under this statute, dismissal is warranted.

## Background

In the complaint, Mr. Kondapalli alleges Fidelity—his former employer—sabotaged his internal and external job applications, remotely controlled his laptop and obstructed his work, placed him on leave, terminated him, surveilled his phone and residences, and bugged and remotely controlled his appliances. Doc. 1 at 1–4. Without elaboration, he also alleges Fidelity

discriminated against him "on the job applications" he filed over the course of six months. Doc. 1 at 1.

To the complaint, Mr. Kondapalli attaches a right-to-sue letter from the Equal Employment Opportunity Commission (EEOC), Doc. 1-1, and the underlying charge of discrimination, Doc. 1-2. In the charge, he alleges:

> I … was hired by Fidelity National Information Services (herein referred to as "Respondent") on or around June 29, 2015, as a Client Services Team Lead, through a Foreign Work-Visa Program, and I believe I have been discriminated against because of my National Origin (Indian) and retaliated against when I engaged in protected activity.
>
> On or around September 2016, Respondent hired a new regional manager, an Indian National from Singapore's FIS office, Mr. Anup Devhade. Almost immediately, Mr. Devhade started to harass me, micromanage my work and make up false stories about my job performance. For instance, on or around early 2017, he instructed me to change the format of a weekly report for a client and the client complained to Mr. Spencer Barrat's manager Rob Macay. When my immediate supervisor, Mr. Spencer Barrat inquired why I had changed the format that made Mr. Barrat incur wrath from his own manager Mr. Rob Macay, I told him that I was instructed to do so by Mr. Devhade as part of redefinition/reorganization of formats under Mr. Anup Devhade's management style. Mr. Spencer Barrat stated that Anup Devhade had told him that it was I who decided to change the form on my own. Mr. Anup Devhade threatened to change my work-visa type several times, so that I could stay locked with FIS. I complained several times to Mr. Spencer Barrat but various other forms of harassment continued.
>
> On or around October 2017, Respondent demoted me to Client Services Senior Analyst and given my prior title "Client Services Team Lead" to a subordinate Jordan Frees whom I taught ABCs of the application as well as the capital markets business that we do. When I complained to my immediate supervisor, Mr. Spencer Barrat, he said to me, "that he was looking for someone to through his weight around." The same supervisor always gave excellent feedback as well as performance appraisals and never mentioned about any issues about my performance either from the clients or internally from the team. Mr. Devhade said "Who's your daddy" immediately after my demotion in front of some of my team members. He intensified his harassment and discrimination

against me. For instance, my manager (Mr. Anup Devhade) and the team lead (Mr. Jordan Frees) would assign tasks to me at the very last minute when they were due, my manager would skip conference calls with clients without notice that he and I were to attend and especially at a time when client had business critical issues that needed discussed in the call and his inputs/expertise were required during the call and would let me take the blame. For example, one of the business issues that Mr. Jordan Frees was working on without much progress for days was assigned to me at the last minute when it was escalated by the client. I offered to help Jordan Frees earlier prior to client's escalation after seeing that Mr. Jordan Frees didn't have the expertise to handle such a complex issue but my offer was met with no response. When I brought this unprofessional behavior to the notice of Mr. Anup Devhade during one of our fortnightly calls that I could not be thrown under the bus by my own manager and my own team lead as was happening, Mr. Anup Devhade said in one of our next call that I said that Mr. Jordan Frees was an American and he would throw Mr. Anup Devhade under the bus. Mr. Anup Devhade always tried to create antagonism between me and my colleagues, especially Mr. Spencer Barrat and Mr. Jordan Frees.

I, in spite of being a highly skilled person as per the definition of my work visa, was made to report to Jordan Frees since 2017 even though he is not highly skilled as per the definition of USCIS work visa program either by having an advanced STEM degree or by having 5 years of progressive experience in a related job. I complained several times to the management, but Respondent never took action to correct the problem. On one occasion, on or around December 10, 2019, one of the HR representatives said to me, ""How would you feel if your own reportee complains on you." The HR representative made me sign a form that I was being disciplined for complaining on my manager's unprofessional behavior and that the form indicated that I had two more chances in the next 365 days.

On or around early 2020, some of my colleagues on the 10th floor at 701 San Marco Blvd started to harass, taunt, and bully me. For instance, on several occasions, some of my colleagues would purposely brush up against my office chair and physically push it, and just keep walking by. I complained to HR in spite of fearing having to sign the above form again, but I didn't get a response. When this matter came up for discussion again in March 2021, the same HR representative told me if she could close the case as we were working remotely from home and my colleagues could not physically harass me anymore. When I complained that the harassment was ongoing from my team via team meetings and

3

online chat, I was told that I had to do my job responsibilities even if it meant enduring harassment. When I failed to respond to emails or chat that were harassing in nature, a verbal disciplinary warning was issued to me by the people's office. This is in spite of my continued notice of harassment to the people's office prior, during, after the said disciplinary action warning.

Recently, I believe that I am being harassed through my laptop and am being given a pretext that the laptop is old, even though the laptop never gave me any trouble prior to ethics hotline complaint made by me in October, 2020. For example, on 05/19/2020, I could not see desktop or icons on desktop but a blank screen for the whole day although it was fine at the time of login. I believe it was done through access privileges management via a software as the screen froze for a few seconds and that software was taking up to 60% of the CPU.

Additionally, my new manager Robert Wrobleski whom I had from 01/01/2020 told me in around April 2020 that I should update my skills/resume on workday. In an effort to get out of the hostile work-environment, I have internally applied for more than nine different positions, which I am more than qualified for and recruiters keep either saying that the positions have been filled or have been cancelled or downgraded. I was being purposely denied my numerous applications in retaliation for my complaints. Also, I believe the purpose of those denials was to round me up back to one of the first positions I applied to but could not take due the position being downgraded after my application. However, I did go back to the hiring manager/recruiter of that position a total of three times after my multiple failed attempts to get a job internally and after the continued to harassment in the team. The goal, it seemed, was to pressure me in my current team to move out, apply on my own to the same job (Treasury Consultant) that I could not take due to its downgrade, and be offered a lower salary than I was originally proposed after having had my salary expectations recalibrated after multiple purposeful job application denials.

Upon bringing the above application sabotages to the company's highest internal complaint body via ethics hotline anonymously to avoid further retaliation, I was not approached for 45 days despite mentioning myself as the candidate who suffered the discrimination. When I came out of anonymity on Dec 09th after having completed 365 days since having signed no-complaint form on Dec 10th, 2019, the harassment continued and even multiplied. It appeared that the pressure was to make me apply to the job that I was originally denied and thereby remove the charge against FIS. The harassment is ongoing to this day even as I write it here.

> Upon information and belief, I am the only Indian National and feel that I am been discriminated, harassed, threatened, shamed and made false allegations against because of my Nationality as well as out of retaliation. Based on the above, I believe Respondent's actions violate Title VII of the Civil Rights Act of 1964, as amended and all applicable state and local statutes. I affirm that the above statement is true to the best of my knowledge, information and belief.

Doc. 1-2 at 1–3.

Mr. Kondapalli moved for a preliminary injunction, asking this Court to prohibit Fidelity "from having any right to access [his] electronic devices," bugging his home, manipulating his associates into harassing him, and "doing any other activity that [he] may not be aware of[.]" Doc. 6. The Court denied the motion, ruling he failed to show a likelihood of success on the merits. Doc. 11 at 2. The Court observed the complaint is a shotgun pleading and the facts alleged in it "do not correspond with the causes of action." Doc. 11 at 2–3.

Mr. Kondapalli responded to the order with allegations to attempt to show he can satisfy the requirements for an injunction. Doc. 12. He included a 97-page "Rebuttal Statement." Doc. 12-1. In these documents, he alleges these facts:

- He had begun working at Fidelity as a "Client Services Team Lead," led a team of eight people, handled customer issues, trained other employees, worked overtime, and received positive feedback. Doc. 12-1 at 8, 10, 17, 92. He was later demoted from team lead, given a new title and different responsibilities, and replaced by someone with less seniority and experience. Doc. 12-1 at 17–18, 92. When he asked about the change, his manager told him that "he was looking for someone who could throw their weight around," even though no one had complained about him. Doc. 12-1 at 18. Fidelity provided a course on unconscious bias, and he believes the team in the videos was like his own and the video was sending the message that he is too technical to be a manager in his team. Doc. 12-1 at 85.

- A manager told him he was eligible for a promotion, but a new manager took over and later promoted others. Doc. 12-1 at 24. When he asked for a

5

promotion, he was told moving internally may be the only or fastest way to get promoted and that a promotion might mean "toppling someone else." Doc. 12-1 at 24.

- His manager mentioned his "position may not exist soon," advised him to apply to other positions, and "asked the whole team to update resumes." Doc. 12-1 at 22, 41. He applied to a job with the title "Senior Treasury Consultant" but was asked to apply to another with a lower pay grade and title and that involved more travel. Doc. 12-1 at 7. The website through which he applied reflected he had received an offer, but the recruiter told him no offer had been formally extended. Doc. 12 at 5. His manager "put an intense pressure to accept" the job—evidently after an offer—and told him the recruiter was waiting for him to accept the offer. Doc. 12 at 7; Doc. 12-1 at 40. He lacked the confidence to confront anyone about the increase in travel between the job for which he originally applied and the one he was offered, but he did not want to travel more because his sons had health issues. Doc. 12-1 at 38, 39. He did not "dare" decline a job on the basis that it was "lower level" in terms of pay grade, title, and travel. Doc. 12-1 at 7, 39. He discussed pay with various managers and recruiters and did not accept the job at the offered pay, and when he later asked the recruiter whether the job was still available, the recruiter told him Fidelity had "moved on with other candidates." Doc. 12 at 8; Doc. 12-1 at 6–7, 26–44. After, he saw Senior Treasury Consultant and Treasury Consultant jobs posted "every now and then." Doc. 12-1 at 7–8. He believes the jobs with the title "Senior Treasury Consultant" were posted to "lure" him, but when he "enquired, the pay grade was again lowered." Doc. 12 at 8.

- He applied to other jobs but was not selected. Doc. 12-1 at 7, 25. He applied for jobs internally but was asked to reapply to lower-grade positions, the jobs were canceled, the jobs were filled soon after his application, or the recruiter rejected his resume for "pretextual" reasons. Doc. 12-1 at 22. He initially applied for jobs at a higher pay grade, but he lowered his expectations to apply for jobs at his then-current pay grade. Doc. 12-1 at 60.

- Recruiters contacted him through LinkedIn and email, and he believes someone from Fidelity caused the contact. Doc. 12-1 at 71–73. For one position, the recruiter had a copy of the resume he had submitted to Fidelity. Doc. 12-1 at 77. Details on an external application—including his home address and phone number—were modified at some point, although he changed only his email address himself. Doc. 12-1 at 77. He reset a password after receiving a notification that an account on a career portal had been created for him. Doc. 12-1 at 71. He received notices of applying to jobs to which he had not applied. Doc. 12-1 at 23, 77. He also received emails containing pictures of women. Doc. 12-1 at 73–74. He received spam

6

text messages and phone calls that disconnected soon after he answered. Doc. 12-1 at 24, 90.

- A manager micromanaged him and "threatened to change" the type of work visa he had so he would be "locked" to Fidelity. Doc. 12-1 at 13, 18–19. He rejects Fidelity's representation that the manager was suggesting he change his own visa and was trying to help him. Doc. 12-1 at 13–14.

- He was assigned last-minute work. Doc. 12-1 at 11, 20. When he complained, his manager falsely alleged he had said the new team lead "is an American and he will throw you under the bus[.]" Doc. 12-1 at 5, 20. The same manager told him another colleague thought he—Mr. Kondapalli—hated the colleague and had asked the manager not to tell him that the colleague had a driving-under-the-influence case. Doc. 12-1 at 5, 20. He believes the manager told him this to make him "antagonistic toward" the colleague. Doc. 12-1 at 5.

- He worked from home during the afternoon, but this arrangement was abruptly canceled. Doc. 12-1 at 94–95. He used lunch hour to transfer his sons from preschool to daycare, but his manager continued to schedule team calls at 1:00 p.m., even after he updated his calendar to show he was busy from 12:30 to 1:30 p.m. Doc. 12-1 at 94. A manager refused his request to work from home during pollen season and had a cold attitude toward him. Doc. 12-1 at 22.

- He did not receive the support he needed during client calls. Doc. 12-1 at 19. His manager often skipped conference calls without notice, including a critical call, which infuriated a client. Doc. 12-1 at 11–12, 19. Directly after the call, the manager was available on Facebook messenger. Doc. 12-1 at 19. When he asked for help, a manager told him he was busy, but he would "chit chat for an hour on non-work-related things." Doc. 12-1 at 11. When he told his manager his network had disconnected during a video call, the manager asked other participants whether the same had happened to them. Doc. 12-1 at 22.

- Other team members made last-minute requests for issues that had arisen earlier in the day. Doc. 12-1 at 14. They would message him while he was away or offline, "making [him] have to check" messages after work or while on break. Doc. 12-1 at 44. After he deleted Microsoft Teams from his phone, Fidelity sent daily messages requesting he log into cloud so Fidelity could install and manage apps. Doc. 12-1 at 14–15. He received the messages at random times, including during the night, and received multiple messages each day. Doc. 12-1 at 15.

7

- After he reported his manager (for unclear reasons), he was required to sign a disciplinary form and told he "had two more chances in the next one year after which [he]'d be terminated." Doc. 12-1 at 20. His internal complaints resulted in investigations that closed "without any relief" for him. Doc. 12-1 at 24. He received disciplinary action "for failing to respond to emails that were harassing in nature." Doc. 12-1 at 87. He declined weekly meetings after he reported harassment in team meetings "and yet nothing happened." Doc. 12-1 at 87.

- He experienced harassment through clients and colleagues. Doc. 12-1 at 87–89. A manager "made remarks to [him] such as 'who's your daddy[.]'" Doc. 12-1 at 18, 94. Other employees passed his aisle when they did not need to; brushed against his chair, physically pushing it and continuing to walk; made faces; stared at him; tried to get his attention; and "followed" him to the restroom. Doc. 12-1 at 9, 21, 24. Clients sent "manufactured or fake issues to resolve for them." Doc. 12-1 at 87. He believes Fidelity "was behind it" and wanted to "send a message" to him. Doc. 12-1 at 87.

- He also experienced harassment through his laptop. Doc. 12-1 at 86. On two days, portals were "kept open" on his browser, but he "didn't do it," and the security team "said that they didn't see any hacking." Doc. 12-1 at 15, 86. He started using airplane mode when he logged off, but when he logged back in the mode had been turned off. Doc. 12-1 at 15, 86. Random text appeared. Doc. 12-1 at 15, 86. His screen blanked. Doc. 12-1 at 16, 86. He was pressured to upgrade his system, which would have erased evidence of system-related tampering "done to harass" him, but he believes the upgrade never happened. Doc. 12-1 at 16.

- He used a Fidelity-sponsored cellphone. Doc. 12-1 at 23. Fidelity required him to take a regulatory course called "Mobile Consent Course" and to sign an acknowledgment that Fidelity had the authority to process photos on the phone. Doc. 12-1 at 22–23, 85. He speculates Fidelity "was trying to delete any screen shots [he] may have had on [his] phone by making [him] agree[.]" Doc. 12-1 at 85. He noticed "Microsoft Apps & Services was granted access to google photos app" on his phone. Doc. 12-1 at 23. He also believes Fidelity may have accessed his personal emails. Doc. 12-1 at 85.

- When he filed an EEOC charge, the evidence file—apparently the "Rebuttal Statement" (Doc. 12-1)—"was deleted from the EEOC portal" and his personal laptop. Doc. 12 at 8. Fidelity has deleted emails he sent to himself containing "sensitive evidence." Doc. 12 at 9.

8

- Fidelity is harassing him to prevent him from continuing with this case. Doc. 12 at 9. He has "been warned/taunted while uploading documents or while in the process of moving with filing the case[.]" Doc. 12 at 9.

- Fidelity entered his home when he was away. Doc. 12 at 9. When using his home restroom, he hears "a soft metal clank noise," which he suspects is "to remind of the harassment that happened in the office." Doc. 12-1 at 90. He has had sleepless nights because of noise from the unit above him, and the noise "followed into the living room" when he went to sleep on the couch. Doc. 12-1 at 90. As he grocery shopped one weekend, someone "zoom[ed]" by him in a sports car, and three trucks idled. Doc. 12-1 at 90.

- He has been suffering from post-traumatic stress disorder for more than a year because of "the ongoing harassment," and the symptoms are worsening. Doc. 12 at 9. He cannot afford treatment because he lost his insurance when he was terminated. Doc. 12 at 9.

The Court construed the response as a motion for reconsideration and denied it, explaining that Mr. Kondapalli failed to present newly discovered evidence, identify manifest errors of fact or law, or show "that any of the scenarios in Federal Rule of Civil Procedure 60(b) apply," and the "response does not address any of the deficiencies" described in the order. Doc. 13.

The undersigned directed Mr. Kondapalli to file an amended complaint by October 14, 2022. Doc. 14. The undersigned summarized applicable rules and laws, explained the deficiencies in the original complaint, instructed Mr. Kondapalli to comply with those laws and rules in drafting the amended complaint, and warned him that "[i]f he fails to timely file the amended complaint, the undersigned will recommend dismissing the case without prejudice, which may affect his ability to sue under Title VII considering the time limitation for suing after receipt of a right-to-sue letter." Doc. 14 at 3–8. The undersigned also directed him to file an amended motion to proceed in forma pauperis. Doc. 14 at 8. The undersigned detailed resources for pro se litigants, including the Legal Information Program. Doc. 14 at 8.

9

Mr. Kondapalli failed to file an amended complaint or an amended motion to proceed in forma pauperis. The undersigned sua sponte extended the deadline to November 23, 2022, detailed the time limitation for suing after receipt of a right-to-sue letter, and warned again, "If he fails to timely file the amended complaint, the undersigned will recommend dismissing the case. **Dismissal may result in an inability to sue on any Title VII claim.**" Doc. 15. Mr. Kondapalli again failed to file a timely amended complaint or motion.

On December 1, 2022, Mr. Kondapalli filed a document titled "Response to Court's Order." Doc. 16. He states, "The court has sought an amended complaint from me to be able to sue on Title VII claim. I have submitted 95-page document titled REBUTTAL STATEMENT that may have been overlooked or missed by the court." Doc. 16 at 1. He states that, "for the convenience of the court," he includes a section of the statement. Doc. 16 at 2; *see also* Doc. 12-1 at 5 (copied portion of the statement). He also states a rumor "circulated" that he "was against Americans and white people," which "unleashed a wave of job application sabotages … as well as fake job interviews. These false allegations were the root cause of the discrimination and harassment[.]" Doc. 16 at 1.

Mr. Kondapalli adds that he was unable to comply with the deadline because his "internet has been under seize [sic] and [his] devices are being actively controlled," his children are being infected with viruses at school, and his parents-in-law were traveling internationally and he "didn't want any untoward incident happening to them." Doc. 16 at 2. He states he sought help from lawyers but "suspect[s] legal help is being actively … blocked. [His] colleagues at [his] new workplace are being manipulated to regulate [his] workload as well as limit help on the new job as a way of threat to prevent

[him] from responding to court." Doc. 16 at 2. He states his "house is still bugged; [his] phone and laptop are still being remotely controlled; [his] internet is completely under siege." Doc. 16 at 2. He contends he "can't respond to the court without the defendant knowing and thus [he is] filing with fear of retribution and retaliation." Doc. 16 at 2.

Mr. Kondapalli "urge[s] that either controlling of [his] devices and network be stopped or that [he] be allowed to file a response with more supporting evidence of title VII claim until after [his] network stops being controlled remotely by the defendant or anyone on behalf of the defendant." Doc. 16 at 3. He contends, "In the absence of either choice, it'd be like asking to file a response against the defendant with the defendant holding a gun to [his] head." Doc. 16 at 3.

## Law

"Pleadings must be construed so as to do justice." Fed. R. Civ. P. 8(e). A court must construe a pleading drafted by a pro se litigant liberally and hold it to a less stringent standard than one drafted by a lawyer. *Tannenbaum v. United States*, 148 F.3d 1262, 1263 (11th Cir. 1998). Liberal construction does not mean excusing noncompliance with procedural rules. *McNeil v. United States*, 508 U.S. 106, 113 (1993). And liberal construction does not mean rewriting a deficient pleading or otherwise serving as de facto counsel. *GJR Invs., Inc. v. Cnty. of Escambia*, 132 F.3d 1359, 1369 (11th Cir. 1998). Rather, liberal construction means that a federal court sometimes must "look beyond the labels used in a pro se party's complaint and focus on the content and substance of the allegations" to determine if a cognizable remedy is available. *Torres v. Mia.-Dade Cnty., Fla.*, 734 F. App'x 688, 691 (11th Cir. 2018). Construing the complaint in that manner avoids an unnecessary dismissal,

11

avoids an inappropriately stringent application of a formal labeling requirement, and creates "a better correspondence" between the substance of the claim and its legal basis. *Castro v. United States*, 540 U.S. 375, 381–82 (2003).

Title VII prohibits employers from discriminating based on race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a). Title VII also prohibits an employer from retaliating against an employee or applicant for opposing "any practice" that violates Title VII or for making a charge, testifying, assisting, or participating in a Title VII investigation, proceeding, or hearing. *Id.* § 2000e-3(a).

To state a Title VII claim, a plaintiff must allege facts making plausible that the defendant discriminated or retaliated against him *because of* his protected characteristic or activity—not merely that he suffered mistreatment and either possesses a protected characteristic or engaged in a protected activity. *See, e.g., Evans v. Ga. Reg'l Hosp.*, 850 F.3d 1248, 1253 (11th Cir. 2017) (holding a Title VII complaint must "provide enough factual matter to plausibly suggest intentional discrimination"), *abrogated on other grounds as recognized in Vital Pharms., Inc. v. PepsiCo, Inc.*, No. 21-13167, 2022 WL 2066406, at *5 (11th Cir. June 8, 2022); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (requiring more than "a sheer possibility that a defendant has acted unlawfully" or "facts that are 'merely consistent with' a defendant's liability" (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007))).

As stated, under the in forma pauperis statute, a court "shall" dismiss an action by a plaintiff proceeding in forma pauperis if at any time the court

determines the action fails to state a claim on which relief may be granted.[1] 28 U.S.C. § 1915(e)(2)(B)(ii).

Federal Rule of Civil Procedure 15(a)(2) provides that a court "should freely give leave [to amend a pleading] when justice so requires." The Supreme Court has interpreted the rule to require a court to freely provide leave to amend unless there is an "apparent or declared reason" to do otherwise, "such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." *Foman v. Davis*, 371 U.S. 178, 182 (1962).

## Analysis

Here, dismissal is warranted under the in forma pauperis statute because Mr. Kondapalli fails to state a claim on which relief may be granted.

---

[1]Separately, a court may dismiss an action for failure to comply with an order as "an inherent aspect of its authority to enforce its orders and ensure prompt disposition of lawsuits." *Jones v. Graham*, 709 F.2d 1457, 1458 (11th Cir. 1983). "The power to invoke this sanction is necessary in order to prevent undue delays in the disposition of pending cases and to avoid congestion in the calendars of the District Courts." *Link v. Wabash R.R. Co.*, 370 U.S. 626, 629–30 (1962).

Where dismissal "has the effect of precluding [a plaintiff] from refiling [her] case due to the running of the statute of limitations .... [t]he dismissal [is] tantamount to a dismissal with prejudice." *Justice v. United States,* 6 F.3d 1474, 1482 n.15 (11th Cir.1993). Dismissal with prejudice is appropriate "only in extreme circumstances"; there must be a clear record of delay or willful conduct that lesser sanctions would be insufficient to correct. *Zocaras v. Castro*, 465 F.3d 479, 483 (11th Cir. 2006) (quoted authority omitted).

Here, dismissal for failure to comply with the Court's orders directing an amended complaint and motion to proceed in forma pauperis would operate as a dismissal with prejudice on any Title VII claim because the time for suing after receipt of the right-to-sue letter has expired. *See* Doc. 1-1 (June 16, 2022, right-to-sue letter); *see also* Doc. 15 (order explaining the time limitation and observing the deadline to file suit was September 19, 2022). Because dismissal is warranted under the in forma pauperis statute, this Court need not decide whether dismissal also is warranted under its inherent authority.

His apparent federal claims of discrimination and retaliation fail under the rationale in the order denying the motion for a preliminary injunction, Doc. 11, the order denying reconsideration, Doc. 13, and the first order directing an amended complaint, Doc. 14. He alleges no facts connecting Fidelity's alleged actions to any protected characteristic or activity.

Giving Mr. Kondapalli a third opportunity to amend the complaint is unwarranted because of his "undue delay," his "repeated failure to cure deficiencies by amendments previously allowed," and "futility of amendment." *See Foman*, 371 U.S. at 182 (quoted). The Court ordered him to file an amended complaint and amended motion to proceed in forma pauperis by October 14, 2022, Doc. 14, and then, when he filed nothing, sua sponte extended the deadline to November 23, 2022, Doc. 15. Both orders were sent by U.S. mail and email.[2] He still has filed no amended complaint or amended motion despite that the undersigned summarized the rules and law, explained the deficiencies in the complaint and motion, warned him about the consequences of failing to file the amended complaint and amended motion, and provided him information about resources for pro se litigants. *See* Docs. 14, 15. The document he eventually filed—forty-eight days after the first deadline and eight days after the second—was neither an amended complaint nor an amended motion to proceed in forma pauperis. Moreover, the allegations he makes in that document show amendment would be futile. He contends that a false rumor that he is "against Americans and white people" caused various forms of

---

[2]Mr. Kondapalli asked the Court to send papers to his email address, Doc. 3, and the Court directed the clerk to copy on future papers the email address he provided, Doc. 8. The clerk's docket entries on October 3, 2022, and November 8, 2022, show the clerk sent him copies of the orders by both U.S. mail and email.

14

mistreatment. Doc. 16 at 1. But he fails to allege the false rumor and mistreatment were because of a protected characteristic or activity.

Mr. Kondapalli contends he should "be allowed to file a response with more supporting evidence … after [his] network stops being controlled remotely." Doc. 16 at 3. He fails to explain how he nevertheless was able to file the "Rebuttal Statement" on December 1, 2022. *See* Doc. 16. He contends he "can't respond to the court without the defendant knowing and thus [he is] filing with fear of retribution and retaliation." Doc. 16 at 2. He fails to explain why he nevertheless was able to file the original complaint, motion for a preliminary injunction, response to the order denying a preliminary injunction, and "Rebuttal Statement." *See* Docs. 1, 6, 12, 16.

Thus, Mr. Kondapalli fails to state a claim on which relief may be granted, and justice does not require giving him a third opportunity to amend the complaint.

## Recommendation

The undersigned **recommends** dismissing the action, denying the motion to proceed in forma pauperis as moot, and directing the clerk to close the file.

## Deadline for Filing Objections

"Within 14 days after being served with a copy of [a report and recommendation on a dispositive issue], a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b)(2). The failure to serve and file specific objections to the proposed findings and recommendations alters review by the district judge and the

United States Court of Appeals for the Eleventh Circuit, including waiver of the right to challenge anything to which no specific objection was made. *See* Fed. R. Civ. P. 72(b)(3); 28 U.S.C. § 636(b)(1)(B); 11th Cir. R. 3-1.

**Entered** in Jacksonville, Florida, on March 15, 2023.

_____
PATRICIA D. BARKSDALE
*United States Magistrate Judge*

c:   Kiran Kumar Reddy Kondapalli
     (by U.S. Mail and email)
     55 Starnberg Ct.
     St. Augustine, FL 32095
     kirankondapalli@gmail.com